**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | |
|---|---|
| **In the Matter of the Search of an iPhone 8, Model No. A1905, located at the Milan Police Department, 7029 Telecom Drive, Milan, Tennessee 38358** | Case No. ___1:24-sw-39-ED___ |

## AFFIDAVIT OF DENNIS WAYNE MITCHELL

I, DENNIS WAYNE MITCHELL, being duly sworn, hereby depose and state that the following is true to the best of my knowledge, information, and belief.

### INTRODUCTION AND TASK FORCE OFFICER BACKGROUND

1.      I am currently employed by the Milan Police Department, and I have been so employed since February 2001.  While at the Milan Police Department, I was previously promoted from Patrolman to Sergeant, and I currently serve as a Lieutenant in the detective division (I received a promotion to Detective in July 2012).  Prior to my employment with the Milan Police Department, I was employed from October 1990 to March 1997 with the Carroll County Sheriff's Department.  During my employment with the Carroll County Sheriff's Department, I served as a Reserve Deputy, a Corrections Officer, and as a Deputy Sheriff.  I achieved the rank of Sergeant during my time with Carroll County.  I also graduated from the Tennessee Law Enforcement Training Academy (T.L.E.T.A.) in October 1993.  During my law enforcement career, I have investigated many different types of crimes against people and involving property.  I have also had special assignments in the Drug Abuse Resistance Education (D.A.R.E.) Program, and I have been assigned to the Milan Municipal Court.

2.      I now primarily investigate sexual crimes against adults and children.  I gained experience in this area through seminars, classes, and everyday work with the Milan Police

1

Department.  I am also currently assigned full-time with the Memphis Child Exploitation Task Force (M.C.E.T.F.).  I have also been a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI) since June 2017.  Since my assignment as a TFO with the FBI, I have investigated many types of violations of federal law, including violent crimes and cybercrimes involving the sexual exploitation of children.  I have gained experience in this area by attending and completing various seminars and training classes provided by the FBI, the Department of Justice, and other investigative agencies, including state, local, and federal agencies, and through my daily work.

3.      As a TFO with the FBI, I am authorized to investigate crimes involving the sexual exploitation of children in violation of, *inter alia*, Tenn. Code Ann. §§ 39-13-527, 39-13-532, 39-17-1003, 1004, & 1005, and Title 18, United States Code, Sections 1470, 2251, 2252, 2422, and 2423.  Section 1470 prohibits an individual from using the mail or any facility or means of interstate or foreign commerce, to knowingly transfer obscene matter to another individual who has not attained the age of 16 years, knowing that such other individual has not attained the age of 16 years, or attempting to do so.  Section 2251(a) makes it a federal offense for any person to employ, use, persuade, induce, entice, or coerce any minor to engage in, or who has a minor assist any other person to engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, or for the purpose of transmitting a live visual depiction of such conduct, or attempting to do so.

Section 2252(a) makes it a federal offense to knowingly possess, access, receive, or distribute a visual depiction involving the use of a minor engaging in sexually explicit conduct (as defined in 18 U.S.C. § 2256(2)(A)), if such visual depiction is of such conduct, or attempting to do so, if that visual depiction has been mailed, shipped, or transported using any means or facility

2

of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, or if the visual depiction was produced using materials that have been so mailed, shipped, or transported.  "Sexually explicit conduct" is defined as actual or simulated sexual intercourse, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or the lascivious exhibition of the genitals or pubic area of any person.

Section 2422 prohibits a person from using a means and facility of interstate commerce, such as the internet and cell phones, to persuade, induce, entice, or coerce a person under the age of 18 to engage in any sexual activity for which any person can be charged with a criminal offense, or to attempt to do so.  Section 2423(a) prohibits a person from knowingly transporting an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory, or possession of the United States, with intent that the individual engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense.  Section 2423(b) prohibits a person from traveling in interstate commerce with a motivating purpose of engaging in any illicit sexual conduct with another person (the term "illicit sexual act" includes a sexual act, as defined in 18 U.S.C. § 2246, with a person under 18 years of age that would be a violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States).

Section 2246(2) defines "sexual act" as including (1) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight; (2)  contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus; (3) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; and (4) the intentional touching, not

through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.  Chapter 109A of Title 18 of the United States Code includes 18 U.S.C. § 2243 (Sexual abuse of a minor), which prohibits a person from knowingly engaging in a sexual act with another person who has attained the age of 12 years but has not attained the age of 16 years, and is at least four years younger than the person so engaging, or attempting to do so.

4.      I have conducted and/or participated in several investigations relating to the sexual exploitation of children.  During those investigations, I have observed and reviewed examples of child sexual abuse material (CSAM) and visual depictions involving the use of a minor engaging in sexually explicit conduct in various forms of media, including computer media.  I have also received training and instruction in the field of investigating CSAM, child sexual exploitation, sex crimes against children, and human trafficking.

## REQUESTED SEARCH OF CELL PHONE

5.      For the reasons set forth below, I submit that there is probable cause to search an Apple iPhone 8, Model No. A1905, which is currently in the possession of the Milan Police Department, 7029 Telecom Drive, Milan, Tennessee 38358 (the "**TARGET DEVICE**").  Some of these electronic records might take the form of files, documents, and other data that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.  They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

6.      Based upon my training, experience, and consultations with law enforcement officers experienced in child exploitation investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM)

card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.  In my experience and consultation with law enforcement officers experienced in child exploitation investigations, I am aware that individuals engaged in child exploitation commonly store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in child exploitation, as well as images and videos of others engaged child exploitation.

7.     This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

   a.  tending to indicate efforts to engage in child exploitation while the victim was underage;

   b.  tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the engagement in child exploitation by individuals;

   c.  tending to identify co-conspirators, criminal associates, or others involved in sex acts with a minor;

   d.  tending to identify travel to or presence at locations involved in child exploitation where the victim involved was under the age of 18 at the time of the occurrence;

   e.  tending to identify the user of, or persons with control over or access to, the TARGET DEVICE; and/or

   f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

8.     As further described in Attachment B, this application seeks permission to locate not only files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how cell phones were used, why they were used, the purpose of their

use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

9.     "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant on the **TARGET DEVICE**. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the **TARGET DEVICE** at a relevant time. For example, your affiant knows from training and experience that persons involved in child exploitation often communicate with others through correspondence or other documents which could provide evidence the victim's exploitation and the offender's means and methods for how he recruits and victimizes.

10.     Based upon my knowledge, training, and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques that often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment.  This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment.  These techniques are often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

11.     Based on the foregoing, and consistent with Fed. R. Crim. P. 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site seizing, imaging and searching as well as off-site imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination

consistent with the warrant.  The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection to determine whether it is evidence described by the warrant.

## INVESTIGATION

12.     The following information was obtained through observations and conversations of your affiant personally, through the assistance of other law enforcement agents and agencies, including reports generated by those agents and agencies, and through other sources specifically named in this affidavit.  Since this affidavit is being submitted for the limited purpose of securing a search warrant for the **TARGET DEVICE**, I have not included every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to obtain the requested search warrant.

13.     On July 27, 2023, I received documents from Maurice Gastelum, who is the father of a minor female who was a student in the Jackson-Madison County School System (that minor female will be referred to in this affidavit as "AG").  Gastelum provided information that his daughter, AG, and **PHILIP STEPHEN PLYLER** (hereinafter, "**PLYLER**"), who was previously employed as a teacher at Northeast Middle School in Jackson, Tennessee, communicated using cellular telephone devices for over 600 minutes during Gastelum's cellular service provider's March and April 2022 billing cycles (as noted above, **PLYLER** was born on January 5, 1983, and thus he was 39 years old when his interactions with AG occurred; AG was 13 years old at the time of her interactions with **PLYLER**).  According to Gastelum, on May 10, 2022, a forensic interview was conducted with AG during an investigation into whether **PLYLER** had engaged in inappropriate conduct with her while he was employed as a teacher at Northeast Middle School.  During that interview, AG stated that, around a month or so before, **PLYLER** gave her his cell

phone number and email address and told her to save that information in her phone under a different name (AG saved the information in her phone under the name "Makk."). AG also stated that she and **PLYLER** began communicating via text messages, telephone calls, and FaceTime calls. AG further stated that she spent several days in **PLYLER's** classroom during second period, and that she was often alone in his room. AG stated that **PLYLER** would often hug her with their bodies facing each other and that he would place his hands near the bottom of her back while hugging her. AG stated that the hugs would last a long time.

14.     One day, when she was upset, AG had her head down in her hands and her leg was shaking. **PLYLER** put his hand onto her side beneath her breasts and kept his hand there, and then asked if he needed to tickle her to make her smile. AG further stated that **PLYLER** knew she liked Red Bull drinks, and that he would bring her a Red Bull drink each week. **PLYLER** also put at least three of his hoodies into her backpack and had her wear his hoodies at school. During one FaceTime call, **PLYLER** told AG to remove her hoodie and pull her shirt tight at the waist. AG stated that she complied, and **PLYLER** told her that he had never seen her without a hoodie on before.

15.     On another day, while the two were in **PLYLER's** classroom, **PLYLER** put his arm behind AG, rested his hand on her shoulder, and then pulled her over to him and had her lay her head on top of his private area. **PLYLER** was wearing pants and a jacket that zipped up, and AG stated that she could feel the jacket's zipper against her head. AG reported that she quickly sat back up after **PLYLER** laid her head down on his private area.

16.     About a week later, during second period in his classroom, **PLYLER** got up from his desk and closed the door and locked it. He then sat beside AG and asked her what she would do if he did "something stupid." AG stated that she got up and went over near the door and then

8

asked **PLYLER** what he meant by that comment.  In response, **PLYLER** said "never mind, that reaction tells me everything I need to know."  AG then asked **PLYLER** if he meant "mm-mmm" (meaning sex).  **PLYLER** said no, and AG pointed to her lips and said, "Do you mean this?" and **PLYLER** said yes.  AG told **PLYLER** that he shouldn't because he is married, has children, and is her teacher, and **PLYLER** said "I know, I'm sorry.  It was just a thought I had."  AG stated that she became upset and went to the bathroom.  **PLYLER** told AG that she could not tell anyone about what happened and that she needed to act normal.

17.    Later, a rumor started going around school that AG kissed **PLYLER** to bring her math grade up.  **PLYLER** talked to AG about the rumor and told her what she needed to say to the school staff about the rumor.  The two were later talking in the middle of night when **PLYLER** asked AG for her home address (**PLYLER** had taken AG's necklace for repairs and offered to bring the necklace to her home).  A few days after that telephone conversation, AG disclosed the truth to the school counselor about had happened between she and **PLYLER**.  AG also disclosed that **PLYLER** came to one of her soccer games early in the morning on a Saturday.  AG stated that, after the game, she talked to **PLYLER**, and he told her that he liked her shorts.

18.    On May 12, 2022, Sgt. T.J. King and Sgt. Bill Young with the Madison County, Tennessee Sheriff's Office met with **PLYLER** in reference to this investigation.  **PLYLER** denied kissing or having a sexual relationship with AG, but he admitted to having contact with her via telephone outside of school.  He claimed that all he wanted to do was help AG.  **PLYLER** drafted a written statement, wherein he admitted that he gave AG his phone number so that she could contact him if she needed to, and that over the course of the next month she contacted him many times via texts or voice calls.  He also addressed some of the events that took place between he

and AG inside his classroom at the school.  As to the events that took place on Thursday, April 14,

2022, **PLYLER** stated as follows:

> On Thursday, April 14th, [AG] was placed in my room again during my planning time.  The previous day, a teacher had made a comment to me that she thought [AG] had a "crush" on me.  I explained to the teacher that [AG] had a lot going on in her life and simply needed some type of consistency (someone to go to if she was having a difficult time).  That Thursday, I asked [AG] what she thought about what the teacher had said.  I was trying to make sure that there [were] no feelings towards me that would cause a problem with me helping her.  She said she thought it was weird and that what the teacher had said was "inappropriate" and "unprofessional."  She still didn't address the question, so I asked her how she would react if I did something dumb.  She thought I was talking about toward the teacher who made the comment.  I said, "No, if I did something dumb toward you."  She got up from the seat she was sitting in and walked a few feet away.  I told her that her reaction told me everything I needed to know.  She then responded that she wanted to know what I meant and made a motion toward her midsection (implying sex).  I said no, nothing like that.  She then pointed to her mouth (implying a kiss), and I said, "Yeah, if I did something dumb like that."  She made some comments to the effect of that is weird and you're a teacher and I'm a student, and even said you have a wife and kids.  The only reason I asked the question is because I wanted to make sure there were no feelings towards me.  It was a foolish way of going about it.  I should have thought about some other way to do it, but that was the only way I could think of that the time.
>
> After this happened, she went to her next class.  I had apologized for even saying it and tried to explain to her why I did.  A little bit later, her teacher came to me and said [AG] was upset that I said something inappropriate to her.  I asked for [AG] to come out to the hallway and talk to me.  When she did, I apologized again for ever saying what I did, and she said the same comments she did before.  I was worried about losing my job, so I asked her to say if someone asked that what upset her was the comment [that] I made previously about they guy she liked being the "flavor of the week."
>
> I realize that the way I went about things was foolish.  I could have handled these situations in a much better way.  I never should have allowed her to contact me outside of school.  I never should have allowed administration and special education to place her in my classroom (especially during my planning time).  I never should have asked her about the comment of a "crush" or asked how she would react if I did something "dumb."  All I wanted to do was to help her out with the things she was going through.  I didn't want her to slip through the cracks and become another statistic.
>
> I never at any time kissed this student.

10

19.     AG and her family subsequently sought an Order of Protection against **PLYLER** in the General Sessions Court for Madison County.  On June 1, 2022, **PLYLER** consented to an Order of Protection being entered against him.

20.     On June 6, 2022, **PLYLER** submitted his resignation to the Jackson-Madison County School System.

21.     On June 8, 2022, Sgt. King received a copy of **PLYLER's** personnel file from the Gibson County, Tennessee Special School District.  According to that file, in October 2015, **PLYLER** was suspended for three days from the Medina Middle School for "unprofessional conduct with students."  **PLYLER** resigned from that school district on May 16, 2016.

22.     On June 14, 2022, Sgt. King spoke with Joe James, via telephone, about **PLYLER's** previous employment as a youth minister at the Main Street Church of Christ in Milan, Tennessee. James, who is a deacon at the church, stated that **PLYLER** had befriended some young girls in the youth group at the church, which created an appearance of impropriety.  James further stated that, to his knowledge, no allegations of abuse had been raised against **PLYLER**.

23.     On June 15, 2022, Sgt. King spoke with David Lyle Piercey, via telephone, about **PLYLER's** previous employment as a youth minister at the Main Street Church of Christ in Milan. Piercey, an elder at the church, recalled that there was an issue of impropriety involving **PLYLER's** relationship with one young female at the church.  Piercey further stated that he believed **PLYLER** left the church on his own accord to go to another church.

24.     On July 5, 2022, Sgt. King spoke with Joe James, via telephone, in reference to this investigation.  James provided more information regarding **PLYLER** during this telephone call. James stated that his daughter, JB, was a member of the youth group when **PLYLER** was at the church, and that JB was around 12 years old at that time (this occurred some 15 years before).

James further stated that **PLYLER** and JB texted extensively with each other during that time-period (James said **PLYLER** and JB exchanged over 3,000 text messages with each other). James said JB never disclosed any physical or sexual relationship with **PLYLER**, but that their relationship was inappropriate. James stated that the church confronted **PLYLER** about his inappropriate relationship with JB, and **PLYLER** later decided to leave the church.

25.     On February 11, 2023, Sgt. King spoke with AS (DOB: April 22, 2001), a former student of **PLYLER's**, via telephone, about this investigation. AS stated that when she was around 13 or 14 years old and a student at the Medina Middle School, **PLYLER** was her math teacher and soccer coach. AS further stated that **PLYLER** was constantly touching her and that he acted inappropriately towards her and several other students, including tickling them and touching their sides. AS also stated that **PLYLER** acted inappropriately with other girls in her church youth group in Atwood, Tennessee. AS stated that, one day, while she was waiting for her mother to pick her up after a middle school soccer game, **PLYLER** took her into the Medina City Park bathroom, locked the door behind them, and had sex with her.

26.     On February 12, 2023, Sgt. King was notified about a Facebook post that had been made regarding **PLYLER** and this investigation. The post was made by Maurice Gastelum, AG's father. The post read as follows:

> For the Carroll Co. and Atwood community. There is a current no contact order in place between a pastor and a minor child from Madison Co. and there is an active investigation with the Madison Co. Sheriff's Department with this particular individual. Atwood Church of Christ has been provided a copy of the no contact order and a copy of the phone records between the two parties and the Elders there still allow this grown man to preach behind a pulpit while he was preying on a 13-year-old girl last year while at Northeast Middle School. Happy Sunday and protect your kids! If you have any info to help with this investigation or other info leading to other minor child victims who are now adults, please contact Sergeant TJ King with the MCSD at (731) 423-6000. The investigation number is 22-002480.

27.     On February 14, 2023, Sgt. King met with another former student of **PLYLER's**, SC (DOB: July 24, 2001), in reference to this investigation.  SC stated that she had heard about this investigation due to a Facebook post from Maurice Gastelum, and that she felt compelled to share her story with Sgt. King.  SC stated that, while she was a juvenile, **PLYLER**, who was her teacher at the Medina Middle School, assaulted her on two occasions outside of school.  The first incident occurred at **PLYLER's** residence located at 6035 Creekside Drive, Milan, Tennessee, when SC was 16 years old.  During that incident, **PLYLER** kissed SC and touched her breasts and vagina over her clothing.  **PLYLER** also tried to touch SC's vagina under her clothing before SC stopped him and left his home.  Afterwards, **PLYLER** messaged SC and said, "I thought that's what you wanted."  **PLYLER** also asked SC not to tell anyone, and said "if you tell anyone, I will lose everything."  After that incident, SC said she kept in contact with **PLYLER** because he made her feel like it was her fault and guilted her by saying things like, "you hate me now" and "I wasn't going to hurt you."

28.     The second incident between **PLYLER** and SC occurred in or around the summer of 2018 at the Jackson Careers and Technology School (JCT) in Jackson, Tennessee.  SC was working in Jackson and **PLYLER** saw her story on Facebook with her location that she tagged. **PLYLER** messaged SC and told her to come see his new classroom and that all the teachers had been working on their classrooms for the upcoming school year.  **PLYLER** sent directions to SC on Snapchat and when she got off work that day she stopped by the JCT.  Once she and **PLYLER** went into his classroom by themselves, **PLYLER** closed the door and grabbed her.  **PLYLER** then started kissing SC before she pushed him away and left the building.  Afterwards, SC ceased all communication with **PLYLER**.  In a written statement made by SC concerning **PLYLER** and this investigation, SC said the following:

> Philip Plyler will never stop being a predator.  He has a track record dating back to his very first year as a middle school teacher [in Milan].  This has to stop now.  We have to protect little girls like me from this man from here on out.

29.     Sgt. King informed SC that the appropriate jurisdictions for what occurred would be the city of Milan and the city of Jackson, and that he would send his report to the police departments in those cities.  SC also provided Sgt. King with several screenshots of Facebook Messenger chats that took place between she and **PLYLER**.

30.     On February 14, 2023, Sgt. King spoke with Carla Wyatt, via telephone, regarding this investigation.  Wyatt said she had seen Maurice Gastelum's Facebook post and wanted to make sure that Sgt. King was aware that she had witnessed **PLYLER** engage in inappropriate activity with several minor female students while she and **PLYLER** were teachers at the Medina Middle School.  Wyatt said she did not witness any explicit criminal behavior (such as touching or kissing), but that she had seen **PLYLER** engage in other inappropriate behavior and that she reported that behavior to the school principal (Steve Maloan).

31.     On February 17, 2023, Sgt. King spoke with RT, another former student of **PLYLER's**, via telephone, regarding this investigation.  RT said **PLYLER** was her teacher and soccer coach while she was a student at the Medina Middle School.  RT stated that **PLYLER** took an interest in her and a few other girls in her class, and that he would lock them in his classroom (one-on-one) so that they could not leave.  **PLYLER** also asked the girls if they had a boyfriend and if they had kissed anyone yet.  RT said **PLYLER's** conduct made her feel uncomfortable, but besides hugging her a few times, **PLYLER** had not touched her.  RT also said that **PLYLER** took her cell phone from her on several occasions and that he would go through it without her permission.

32.     On the same date, Sgt. King spoke with HH, another former student of **PLYLER's**, via telephone, in reference to this investigation.  HH said **PLYLER** was her teacher and soccer coach while she was a student at Medina Middle School.  HH recalled that **PLYLER** had weird conversations with her, wherein he would ask her if she had a boyfriend and whether she had kissed anyone before.  HH also recalled that **PLYLER** texted her a few times which made her uncomfortable.  HH said **PLYLER** took her cellphone and looked at it (including her photographs and messages) without her permission.

33.     On February 23, 2023, Sgt. King spoke with KR, another former student of **PLYLER's**, via telephone, in reference to this investigation.  KR said **PLYLER** was her teacher when she was at the Medina Middle School.  KR also said **PLYLER** exhibited some questionable behavior with several students at the Medina Middle School, especially his female soccer players.  KR recalled some inappropriate comments made by **PLYLER**, that he would have 7:00 a.m. music listening sessions in his classroom, and that the students **PLYLER** really liked would sit right next to his desk.  KR provided a written statement regarding **PLYLER**.  Her statement reads as follows:

> Recently, I was informed that there is an investigation being conducted into the potential crimes committed by pastor, teacher, and coach Philip Plyler.  Although I was never physically assaulted because of a lack of true opportunity, he exhibited inappropriate behavior that I did not identify as grooming at the time.
>
> From 2012-2013, I was in Plyler's 7th grade math class.  I was one of the highest achieving students, and I greatly sought approval from my teachers that I was not receiving at home due to my parents having issues with addiction.  I was 12 and 13 years old.  During that time, I was recovering from previous grooming, assaults, and abuse that hurt me significantly.  Because of this, I had behavioral issues and an undiagnosed anxiety problem.  I stressed my grades severely because they sometimes seemed like the only thing I could control.
>
> One afternoon early in the school year, we were being handed back a graded test.  I cannot remember exactly what the test was about, but I do remember the severe anxiety attack I was attempting to conceal.  When Plyler handed me back my test, he saw me visibly stimming and told me, "You need to take a Xanax."  At this time, I laughed this comment off because I assumed it was just a joke.

As time progressed throughout the school year, I noticed that Plyler would frequently have students in his classroom as early as 7 a.m. to discuss schoolwork and listen to music. Oftentimes, students were just hanging out. There were several times when I came to his classroom for various reasons to get help with assignments. Most of those instances were normal because there were other students in his classroom.

However, one morning that winter, I was alone in his classroom getting help with the Unit Price project we were completing. It was one of our most important projects, and I was worried about having to complete it at home. I was confiding in him that I was facing bullying by a group of classmates, one of whom I was sitting next to because of assigned seating. While I was in middle school, a majority of the harassment I experienced was associated with my chest size due in part to a precocious puberty at 9 that left me with a large chest at a young age. Plyler, instead of offering to move me or the student to another seat, [ ] said, "Men will definitely love your large chest as you get older," and laughed. I felt uncomfortable but also flattered. Again, I was not in a position to report him or even recognize that it was an issue because I was grateful for the attention. Plyler sat incredibly close at this point and would put his hand on my knees or shoulders frequently. He also encouraged me to try out for the soccer team and that I would make "a good goalie," but I was never very athletic and was already in the band, plus I was worried about bullying, so I never did.

Although these instances were just passing moments in time, the statements have stuck with me for years. I truly believe Philip Plyler is a predator that has used his position and authority to target vulnerable kids. He should be facing massive consequences for his actions and statements and should never be allowed around children again. I can only hope that I can help any victims of his predation achieve true justice and peace.

34.     On March 1, 2023, I spoke with SC at the Milan Police Department. Before speaking with her, I received and reviewed several reports and documents which were provided to me by Sgt. King, including documentation of conversations that occurred between **PLYLER** and SC on Facebook Messenger and Snapchat. During my review of those conversations, I observed that **PLYLER** and SC were conversing well into the late evening hours and sometimes into the early morning hours. The conversations between the two also seemed inappropriate to me because of the age difference between **PLYLER** and SC, because **PLYLER** was SC's former teacher, and because of the nature of the conversations, including conversations where **PLYLER** and SC

discussed SC appearance and whether SC had been sexually active in the past. The two also discussed having SC babysit **PLYLER's** children at **PLYLER's** home and him being present at the home while SC was there.

35.     On January 18, 2024, I interviewed SC. SC stated that she is currently 22 years old. She discussed an incident that occurred between she and **PLYLER** at **PLYLER's** home in Milan in 2017. SC stated that she went to **PLYLER's** home to deliver eggs that **PLYLER** had purchased from SC's mother. SC described the house where she went as a one-story brick house with a garage to the left and a front door to the right of the garage. SC recalled that the incident at **PLYLER's** home occurred after her 16th birthday on July 24, 2017. SC recalled that she had not been driving long when this incident happened. SC stated that after she went inside **PLYLER's** residence, he showed her around the home. Eventually, **PLYLER** grabbed SC with a tight grip and led her into his bedroom. He then started kissing SC and got on top of her as he laid her on her back on the bed. **PLYLER** positioned himself between SC's legs and thrusted against her while he was on top of her. **PLYLER** also used his hands to touch SC as he held her down on the bed with his body. SC was ultimately able to get away from **PLYLER** and leave his home. SC also disclosed that **PLYLER** sexually assaulted her in Jackson after the incident with him at his home in Milan.

36.     During the interview, SC provided me with **PLYLER's** Snapchat and Facebook Messenger account information. She also discussed how she and **PLYLER** communicated with each other. SC stated that she used the screen name "Fatty" to identify **PLYLER** on Snapchat. SC also stated that **PLYLER** sent her nude images of himself via Snapchat. SC provided the cell phone number of 731-613-3847 as **PLYLER's** number. The name associated with this number on SC's phone is "Gracie PP," but SC said the number was **PLYLER's**, as she changed the screen

name to prevent her mother from knowing that she was talking with **PLYLER**. SC also provided another girl's name, AS, as a possible additional victim of sexual abuse perpetrated by **PLYLER**.

37.     On January 26, 2024, I interviewed AS. AS stated that she is currently 22 years old. She said **PLYLER** was her teacher and soccer coach at Medina Middle School, and that he sexually assaulted her on three occasions in three different locations. The first time **PLYLER** assaulted AS was at the Medina City Park inside the women's restroom by the first soccer field where AS practiced soccer. AS stated that this incident occurred during the fall of 2014. AS was waiting to be picked up after soccer practice and went into the women's restroom. After she went inside, **PLYLER** entered the restroom and locked the door behind him. **PLYLER** started kissing AS and used force to move her into a position to have sexual intercourse with her. AS's back was pinned against the stall during the assault. AS closed her eyes during the assault and could not see anything and did not hear anything either. **PLYLER** put his penis inside AS's vagina and had sexual intercourse with her in the women's restroom. **PLYLER** also grabbed AS's buttocks with his hands. **PLYLER** told AS to be quiet and not to say anything.

38.     The second incident occurred at **PLYER's** house in Milan sometime in the spring of 2015 (AS believes the incident occurred sometime after March 1, 2015, and before April 22, 2015). On the date of this incident, AS was supposed to babysit for **PLYLER** and his wife, Sarah. Sarah was not home when AS arrived at the residence that day; rather, **PLYLER** was at his home alone. The sexual assault happened on the living room floor. During the assault, **PLYLER** used his hands to pin AS's hands to the floor. AS could feel the carpet against her back and **PLYLER's** hands around her wrist. **PLYLER** engaged in vaginal intercourse with AS during this incident. **PLYLER** also put his penis in AS's mouth and made her perform oral sex on him.

39.    The third sexual assault occurred at a Christian youth camp in Alabama (subsequent investigation determined that the assault occurred at the Indian Creek Youth Camp in Oakman, Alabama).  **PLYLER** and AS had vaginal intercourse in a cabin at the camp.  AS stated that **PLYLER** took her to the youth camp in Alabama in the summer of 2015 around the Fourth of July holiday.  Towards the end of the camp, and after several of the camp attendees had left, **PLYLER** sent AS to clean a cabin.  After AS went inside the cabin to start cleaning it, **PLYLER** came inside and ultimately had vaginal intercourse with her.  AS stated that **PLYLER** pinned her back against a bed post while they were having sex, and that **PLYLER** grabbed her buttocks and told her to be quiet and not say anything.

40.    A background check of **PLYLER** revealed that he graduated from Freed-Hardeman University and obtained a job with the Milan Special School District for the 2005-2006 school year.  **PLYLER's** employment with the Milan Special School District was not renewed for the 2008-2009 school year.

41.    On August 6, 2010, the Humboldt City Public Schools employed **PLYLER** as a teacher for the elementary school for the 2008-2009 school year, and for the middle school for the 2010-2011 school year.  In January 2011, Plyler started a job as a pastor with the Atwood Church of Christ in Atwood, Tennessee.  **PLYLER** held that position until March 2023.  Atwood Church of Christ Secretary Rachel Hays provided me with documents to establish **PLYLER's** employment with the church.

42.    According to the Gibson County School District, in 2012, **PLYLER** was employed as a teacher for that school district.  According to a document dated October 9, 2015, **PLYLER** was reprimanded for unprofessional conduct with students.  On May 16, 2016, **PLYLER** resigned from his position at the Medina Middle School.

43.     According to documentation provided by the Jackson-Madison County School District, **PLYLER** started working for or was in the process of working for that school district in or around 2016.  On April 27, 2022, Plyler was suspended amid an investigation by the school and the Madison County Sheriff's Department for misconduct with a middle school student (AG).

44.     On March 7, 2024, **PLYLER** was charged with two counts of sexual battery by an authority figure, in violation of Tenn. Code Ann. § 39-13-527, and one count of statutory rape by an authority figure, in violation of Tenn. Code Ann. § 39-13-532, in the Municipal Court of Gibson County, Tennessee in Milan (Case Nos. 24M0075 & 79).  These charges relate to the incidents involving SC and AS in Gibson County (described in further detail in this affidavit).  Following the filing of these charges, a warrant for issued for **PLYLER's** arrest.

45.     On March 12, 2024, I interviewed Joe James.  As noted above, James is a member of the Main Street Church of Christ in Milan.  James hired **PLYLER** as an assistant youth minister at the church soon after **PLYLER** started his employment with the Milan Special School District. After **PLYLER** was hired, James noticed that **PLYLER** was acting inappropriately with young girls at the church.  James said he counseled **PLYLER** about this inappropriate behavior.  James further stated that **PLYLER** would bring a girl to church alone without a chaperone and that he would spend more time with the young girls than the young boys at the church.  James also stated that **PLYLER's** wife, Sarah, went to work for James and his wife, Cindy James, at the UPS store in Jackson.  James recalled that one day Cindy had lunch with Sarah to confront Sarah about **PLYLER's** behavior after **PLYLER** started acting inappropriately with the James's daughter, JB. James had already counseled **PLYLER** about his relationship with JB.  James said the church elders confronted him after they had received complaints from other members about **PLYLER's** behavior with other young girls at the church.  James met with the church elders and told them

what he knew about **PLYLER's** behavior.  Soon thereafter, **PLYLER** left the church.  James later learned that **PLYLER** was being considered for the position of pastor at the Atwood Church of Christ.  James said he called a friend who went to the Atwood Church of Christ to discuss **PLYLER**.  James's friend told him that **PLYLER** had repented his sins.  James subsequently learned that the Atwood Church of Christ had hired **PLYLER** as its pastor.

46.   I also interviewed Cindy James concerning what she discussed during her lunch with Sarah Plyler.  Cindy stated that she asked Sarah to lunch so that she could confront her about **PLYLER's** behavior with some of the young girls in the youth group at the Milan Church of Christ, including her daughter, JB.  During their lunch, Sarah told Cindy that she had found out that **PLYLER** had engaged in over 3,000 messages and calls with JB at inappropriate times during the day and night.  Cindy suggested that Sarah confront **PLYLER** about this and that his behavior needed to stop.  Cindy said she then saw a message a few days later from Sarah to JB wherein Sarah told JB to leave **PLYLER** alone.

47.   On March 12, 2024, I interviewed another former student of **PLYLER's**, AC, in reference to this investigation.  **PLYLER** was AC's teacher and youth minister.  AC stated that she took youth trips with **PLYLER**, and that during those trips, he wanted to be one-on-one with her.  AC further stated that **PLYLER** would hug her for too long, and that he would touch her legs between her knees and thighs (and close to her vaginal area).  AC explained that when **PLYLER** would put his hands on her legs, it seemed like how a husband would place his hands on his wife's legs.

48.   I also interviewed another former student of **PLYLER's**, LP, in reference to this investigation.  LP stated that **PLYLER** would ask her if he could pick her up for church.  LP said her parents would not allow him to pick her up.  LP felt like **PLYLER** was trying to have a

relationship with her.  She said she was one of **PLYLER's** favorites in the classroom, and that he did not apply the same rules to her that he applied to other students.  **PLYLER** tried to get LP to come inside his classroom by herself and shut the door to talk, but LP never did that.  She also said **PLYLER** texted her a lot.

49.     On March 21, 2024, I interviewed JB (DOB: November 14, 1993).  JB said she met **PLYLER** while she was in the eighth grade at the Milan Middle School.  **PLYLER** also became JB's youth leader at the Main Street Church of Christ in Milan.  Based on her conversations with **PLYLER**, JB believes **PLYLER's** first teaching job was with the Milan Middle School, and that the Main Street Church of Christ was **PLYLER's** first managerial job.  JB recalled **PLYLER** showing her favoritism at school and at church.  **PLYLER** wanted JB to sit close to him at school, church, and on youth trips, and he would bring a cooler specifically for JB to sit next to him on the church bus on the way to youth events.  JB said she and **PLYLER** spent a lot of time communicating through instant messaging and by calling each other.  JB said the calls and texts between she and **PLYLER** would total in the hundreds each day.  JB provided the cellular telephone number that **PLYLER** called and texted her on as 731-613-3847.  JB's father, Joe James, and mother, Cindy James, noticed the attention that **PLYLER** was giving to JB.  JB recalled that her father confronted **PLYLER** about **PLYLER's** inappropriate behavior with JB and with some of the other girls in the youth group at the church.  JB also talked about **PLYLER's** wife, Sarah, who worked for her parents at the UPS store in Jackson.  JB provided me with a text message that she received from Sarah Plyler following Sarah's lunch with her mother (Cindy), during which Cindy confronted Sarah about **PLYLER's** inappropriate behavior with JB.  Sarah texted JB after her lunch with Cindy and said, "Don't keep my hubby away from me."  JB also recalled that after **PLYLER** lost his jobs at the school and church, he would still call or text her and ask her to meet

him at the football games in Milan and in the parking lot by his truck because he had a gift for her. On one occasion, **PLYLER** gave JB an Alabama hoodie.  **PLYLER** would also frequently ask JB to dog sit at his house in Milan, but she never did.  JB had been to **PLYLER's** home before with the youth group, but never alone.  JB said she knew it wasn't a good idea to go over to **PLYLER's** home alone because of their relationship and her parents not wanting her to communicate with him.  I asked JB about whether she had gone on any church trips out of state, and she recalled going to the Indian Creek Youth Camp in Oakman, Alabama.  JB provided the following statement in her own words regarding her experiences with **PLYLER**:

> During the interactions with Plyler from 2008-2011, I did not realize the inappropriate nature of the relationship, but now, as an adult, I am well aware that his intentions were not pure and that he was abusing the role of authority he had in my life as both my teacher and youth minister to a dangerous degree that could have escalated at any time.

50.    On March 25, 2024, I interviewed Haley Rogers, who was and still is a member of the Atwood Church of Christ.  Haley recalled **PLYLER** bringing AS to the church with him. Rogers recalled a young girl (believed to be AS) going on youth trips with the church youth group to Gatlinburg, Tennessee, for the Challenge Youth Conference (CYC).  Rogers believes AS would have been in the seventh or eighth grade during those trips.  Rogers also recalled AS telling her that **PLYLER** baptized AS in the hot tub in the cabin and assumed that AS was talking about the cabin where the youth group stayed during the CYC trips.

51.    Rogers also recalled seeing **PLYLER** and AS sitting by themselves and talking late into the night during a trip to the CYC.  Rogers does not recall AS returning to church after the church's 2015 CYC trip. Haley recalls asking **PLYLER** if AS was going to attend the church's CYC trip the following year (2016), and **PLYLER** responded, "No, she (AS) won't be coming back."  Rogers described **PLYLER's** tone with her as if he wanted her to drop the subject.

52.     Rogers noticed that **PLYLER** would never allow AS to be alone with the other church youth members or on youth trips.  **PLYLER** was always around AS, and Rogers said, looking back, **PLYLER's** behavior was strange.  Rogers described a game that only **PLYLER** and AS would play together.  **PLYLER** would never play this game with any other youth member. **PLYLER** and AS would throw whipped cream on each other, and **PLYLER** would tackle AS to the ground.

53.     Rogers never recalled **PLYLER's** wife, Sarah, going on youth trips with the church. I asked Rogers about **PLYLER's** trips to the Indian Creek Youth Camp (ICYC) in Oakman, Alabama, and if they would have traveled there in the church van.  Rogers stated that if **PLYLER** went to the ICYC in Alabama, she did not believe the church paid for the trips.  Rogers said she never went to the ICYC with **PLYLER**.

54.     Rogers saw a Facebook post about **PLYLER** in 2023 and mentioned the post to her father, Jeff Stout, who is a deacon at the Atwood Church of Christ.  Rogers said it is her understanding that **PLYLER** met with the church elders and lied about what had happened (*i.e.*, what the Facebook post said **PLYLER** did), but he later told the elders the truth.  Soon thereafter, Sarah Plyler's parents came to Tennessee and picked up Sarah and her children and took them to West Virginia.  Rogers recalled that the church members checked on **PLYLER** daily because they were concerned that he would harm himself.  Rogers told me that Rachel Hays could provide more information concerning **PLYLER's** trips to the ICYC and that Hays might have spoken with Sarah Plyler about **PLYLER's** recent arrest in West Virginia (as noted above, a warrant was issued for **PLYLER's** arrest on March 7, 2024; **PLYLER** was subsequently arrested in West Virginia on the Gibson County arrest warrant).

55.     On March 25, 2024, I interviewed Rachel Hays, who is a member and the secretary of the Atwood Church of Christ.  Hays recalled that **PLYLER** brought a young girl (believed to be AS) to church with him.  Hays said the young girl played soccer for **PLYLER** at the Medina Middle School.  Hays recalled going to the ICYC with **PLYLER** one time during her senior year in high school (2014).  Hays also recalled that **PLYLER** took his daughter to the ICYC once, but no one else from the church went with them, and that this trip was the year before **PLYLER** left the church.  Hays recalled that **PLYLER** would always sit and hang out with the 20-year-old and younger girls, not with the boys or with the men of the church.

56.     Hays attended the Challenge Youth Conference (CYC) in Gatlinburg, Tennessee, as a chaperone in 2015 and 2016.  **PLYLER** presented a young girl (believed to be AS) as a troubled teen in need of help.  Hays recalled seeing a Facebook post about **PLYLER** before a Sunday morning church service at the Atwood Church of Christ.  Some church members had not seen the post yet.  Hays recalled that **PLYLER** preached to the church that morning as if nothing had happened.  However, by the following Wednesday, **PLYLER** was no longer the pastor of the church.  Hays said she would assist me with confirming the details of **PLYLER's** trips to the ICYC in Alabama, particularly **PLYLER's** trip with AS around June and July 2015, by looking through church documents and financial records.

57.     On March 26, 2024, I interviewed Hays again.  She brought bank statements from the time-period when AS would have attended the ICYC in Alabama with **PLYLER** (June-July 2015).  Hays could not find any church records documenting **PLYLER** and AS's trip to the ICYC. However, she found a photograph of **PLYLER** and AS, dated July 8, 2015, that was taken of them while they were attending the ICYC in Alabama.  Hays searched for a Facebook friend from ICYC and located this photograph on her friend's Facebook page.  Hays identified the location of the

25

photograph as the worship area at the ICYC.  Hays also identified **PLYLER** in the photograph and believed that the girl sitting next to **PLYLER** in the photograph is AS.

58.     At the conclusion of my interview with Hays, she stated that before **PLYLER** and his wife, Sarah, left the Atwood Church of Christ and moved to West Virginia, Sarah told Hays that she had "grounds for divorce."

59.     On March 27, 2024, I received a call from Carla Wyatt, who was a teacher at the Medina Middle School while **PLYLER** was employed there.  Wyatt stated that **PLYLER** did strange things that she noticed and reported to the middle school principal, Steve Maloan.  Wyatt also stated that **PLYLER** tutored a young girl, CH, and that she saw them alone in **PLYLER's** classroom.  Wyatt said she saw **PLYLER** sitting close to CH and looking at CH funny, which Wyatt described as flirtatious.  On three other occasions, Wyatt observed **PLYLER** engage in inappropriate behavior with AS.  The first incident was like **PLYLER's** behavior with CH in his classroom.  During the second incident, Wyatt went to the concession stand and unlocked the door.  Once she was inside the concession stand area, she saw **PLYLER** and AS alone inside the concession stand behind locked doors.  Wyatt believed that there was a soccer game or practice at that time.  She remembered seeing **PLYLER** and AS filling a cooler with ice.  In the third incident, Wyatt was in the gym during eighth-grade play day when she saw **PLYLER** and AS playing one-on-one basketball.  While the two were playing, **PLYLER** put his nose in AS's shirt as if he were smelling her.  Wyatt saw that **PLYLER's** face was close to AS, and AS pulled her shirt forward.

60.     On March 28, 2024, I interviewed another former student of **PLYLER's**, DB.  DB recalled seeing a folder on **PLYLER's** desktop school computer with the names of two girls on the folder.  DB provided the names and contact information for both girls.  DB also recalled that **PLYLER** gave more attention to the girls in his class than the boys.  DB said the boys were treated

differently.  The girls could sit around **PLYLER** and sit on his desk in class, especially the pretty, more popular girls.

61.     On March 29, 2024, I interviewed AB, one of the two girls that DB identified in his statement to me.  AB stated that nothing inappropriate happened between she and **PLYLER**, but that **PLYLER** texted AS often and that he discussed inappropriate things with her, including asking AS to ride with him to and from soccer games, asking AS to hang out with him, and flirting with her.  AB thought this was inappropriate conduct because of **PLYLER's** position as AS's teacher and coach.  AB recalled rumors around the school about **PLYLER** and his inappropriate behavior around female students, including seventh and eighth-grade girls.  I asked AB if there was a reason why **PLYLER** would have pictures of her on his school desktop computer, and she said no and expressed surprise at hearing the question.

62.     On April 1, 2024, I interviewed AS's mother, Krista Sanders.  She stated that AS and her father had a good relationship when AS was younger, but that issues arose AS went to high school.  Some of the problems with AS surrounded her attending a Church of Christ church because AS was raised in the Baptist church, and there were issues concerning the different doctrines being taught in the churches.   On Wednesday nights, Krista would take AS to the Atwood Church of Christ.  Krista also recalled **PLYLER** picking up AS and taking her to the Atwood Church of Christ on some nights.  Krista did not recall **PLYLER's** wife ever being with **PLYLER** when he picked AS up for church.  Krista said she knew about **PLYLER** and AS texting each other but did not know what they were talking about.  Because **PLYLER** was AS's teacher and minister at the church, Krista believed **PLYLER** was counseling AS.

63.     Krista stated that AS took a summer trip to Alabama with **PLYLER**.  Krista recalled dropping AS off to go with **PLYLER**, but she could not remember the details of the trip at that

time.  Krista remembered that AS had a few gaps in her summer schedule that year (AS played travel softball back then).  AS told Krista that she went to Alabama with **PLYLER** in July 2015, and that date was consistent with Krista's calendar.  Krista believed the Atwood church youth group went on the trip because AS told her that the church was going on the trip.  Krista also believed that AS received a scholarship from the church and that the church paid for AS's way to Alabama.  Krista recalled asking **PLYLER** about payment for AS's travel expenses, and that **PLYLER** told her that the church had money to cover non-members and that they would cover AS's expenses.  Krista knew some of the people at the Atwood Church of Christ and worked with one person who was a member there.  Krista said that this raised her comfort level, so she allowed AS to attend the church and be with **PLYLER**, the church's pastor.

64.     Krista also discussed the Facebook post about **PLYLER**.  After she learned of the post, Krista asked AS how bad the situation was between her and **PLYLER**, and AS responded, "enough to put him under the jail."  Krista also stated that she believes **PLYLER** groomed both she and AS.  **PLYLER** developed a relationship with her, as well as with her daughter.  He tutored and encouraged AS in sports and with spiritual matters.  Krista believes **PLYLER** developed a relationship with her so that he could be involved with AS.

65.     On April 8, 2024, I spoke with Krista again concerning AS's trip with **PLYLER** to the ICYC in Alabama in the summer of 2015.  Krista informed me that she had done some research and confirmed that **PLYLER** picked up AS at AS and Krista's residence in Medina on July 4, 2015, and that **PLYLER** and AS attended the camp until on or about July 10, 2015.  When **PLYLER** picked AS up, Krista recalled that he was driving a van and his wife, Sarah, and their children were with him.  Krista stated that AS played in a softball tournament in Jackson the weekend before she went with **PLYLER** to Alabama (on or about June 28-30, 2015), and that AS

had another softball tournament in Florida that began on July 10, 2015. Because AS had to be in Florida on July 10, 2015, to play in the softball tournament, Krista met with **PLYLER** and AS somewhere in Alabama after the camp was over and picked up AS to drive her to the Florida tournament. Krista noticed that **PLYLER** was driving the same van when she picked up AS in Alabama, but Sarah Plyler and their children were not with **PLYLER** and AS. Krista asked **PLYLER** about Sarah and the children, and **PLYLER** responded that his wife and children did not go on the church trip.

66.    On March 26, 2024, **PLYLER** waived his constitutional and legal rights regarding extradition in the Circuit Court for Marion County, West Virginia, Division II (Case No. 24-P-25), and will be transported from West Virginia to Gibson County to appear in court for the charges discussed above.

67.    When **PLYLER** was arrested in West Virginia, he had in his possession an iPhone 8, Model No. A1905 (the **TARGET DEVICE**). **PLYLER** was searched incident to his arrest and the **TARGET DEVICE** was seized by the executing officers. The **TARGET DEVICE** was then transferred to the Milan Police Department where it remains today.

68.    On April 10, 2024, a criminal complaint was filed against **PLYLER** in the United States District Court for the Western District of Tennessee (Case No. 1:24-cr-10016-STA), charging **PLYLER** with violations of 18 U.S.C. § 2423(a), (b), and (e).

69.    On April 22, 2024, a two-count indictment was returned against **PLYLER** in the United States District Court for the Western District of Tennessee (Case No. 1:24-cr-10016-STA), charging **PLYLER** with violations of 18 U.S.C. § 2423(a), (b), and (e).

70.    Based on my training, knowledge, and experience, I know that individuals like **PLYLER**, who, as set forth in this affidavit, engaged and attempted to engage in inappropriate and

29

illegal relationships with minors for the past several years, will not cease such criminal conduct but instead will continue to engage in such conduct. Moreover, as noted above, such individuals, like **PLYLER**, who have engaged in this type of criminal conduct for a prolonged period, are also often interested in accessing and viewing, via the internet or from other sources accessible by cell phones (such as the **TARGET DEVICE**), visual depictions of minors engaged in sexually explicit conduct. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

71.     Thus, based on my training, knowledge, and experience, and given the facts set forth above, which establishes that **PLYLER** has engaged and attempted to engage in inappropriate and illegal relationships with multiple minor females for several years, that he has communicated and carried out his inappropriate and illegal relationships with those minor females via his cell phone through the use voice calls, texts, and social media applications, and that he has engaged in illegal conduct by the use of his cell phone, including sending nude images of himself to at least one of the minor victims (SC), there are reasonable grounds to believe that contraband or evidence of criminal activity will be found on the **TARGET DEVICE**.

72.     More specifically, based on my investigation, I learned that the Apple iPhone 8 was released by Apple on September 22, 2017. As set forth above, SC alleged that **PLYLER** engaged in an inappropriate physical relationship with her in 2017 and 2018, that the two communicated often by Snapchat and Facebook Messenger, and that **PLYLER** sent nude images of himself to her on Snapchat using his cell phone.[1] Additionally, AG alleged that **PLYLER** engaged in an inappropriate relationship with her in 2022, including that the two communicated daily via text

---

[1] As noted above, 18 U.S.C. § 1470 prohibits the interstate transfer of obscene matter to another individual who has not attained the age of 16, and any attempts to do so. SC was born in July 2001, and therefore did not attain the age of 16 until July 2017.

messages, telephone calls, and FaceTime calls.  Therefore, I submit that there is probable cause to believe that evidence of **PLYLER's** communications with SC and AG, among other minor females, will be found on the **TARGET DEVICE**, as there are reasonable grounds to believe that **PLYLER** used the **TARGET DEVICE** to communicate with SC and AG, including communications that would be in violation of, *inter alia*, 18 U.S.C. §§ 1470 and 2422(b).

## CONCLUSION

73.     Your affiant asserts that the foregoing facts establish probable cause to believe that the **TARGET DEVICE** contains contraband and/or evidence of criminal activity, including, but not limited to, evidence of violations of Title 18, United States Code, Sections 1470, 2251(a), 2252(a)(1), (2), & (4), 2422(b), and 2423(a) & (b).

74.     Therefore, I respectfully request that the attached warrant be issued authorizing a search of the **TARGET DEVICE**, described more fully in Attachment A, for of the items listed in Attachment B.

**AND FURTHER YOUR AFFIANT SAITH NOT**.

Dennis Mitchell – Affiant
TFO – Federal Bureau of Investigation

Pursuant to Federal Rule of Criminal Procedure 41(d)(3), the undersigned judicial officer has on this date considered information communicated by [X] telephone or [ ] other reliable electronic means or [ ] both, in reviewing and deciding whether to issue a search warrant.  In doing so, this judicial officer has placed the affiant under oath and has confirmed by speaking personally with the affiant on the telephone [ ] that the signatures on the application and affidavit are those of the affiant or [X] that the affiant has authorized the placement of the affiant's signatures on the application and affidavit, the documents received by the judicial officer are a correct and complete copy of the documents submitted by the affiant, and the information contained in the application and affidavit are true and correct to the best of the affiant's knowledge, information, and belief.


Sworn to and subscribed before me in Jackson, Tennessee, on this the _23_ day of _April_, 2024.

_____
JON A. YORK
UNITED STATES MAGISTRATE JUDGE